**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

PEDIATRIX SCREENING, INC. and    )
PEDIATRIX SCREENING, L.P.,        )
                                    )
          Plaintiffs,         )
                                      )
        v.                 )    Civil Action No. 01-2226
                                      )
TELECHEM INTERNATIONAL, INC.,   )
                                    )
         Defendant.       )

**MEMORANDUM OPINION**

Pending before the Court are objections by Plaintiffs and Counterclaim Defendants Pediatrix Screening, Inc., and Pediatrix Screening, L.P. (collectively, "Pediatrix"), to the Report of Proposed Findings and Recommendation of Special Master. (Docket No. 216, "Pediatrix Obj.") For the reasons discussed below, the Special Master's recommendations are accepted in part and modified in part.

I.    **INTRODUCTION**

    A.    <u>Factual Background</u>[1]

Since its founding by Dr. Edwin Naylor in the 1980s, Pediatrix[2] has been in the business of biochemical and molecular research and development, focused on testing blood specimens of newborn infants to detect potential metabolic disorders. The two Pediatrix entities are a Pennsylvania limited partnership and a Pennsylvania corporation, located in Bridgeville,

---

[1]  Unless otherwise noted, the facts in this section are undisputed.

[2]  The two entities formerly known as NeoGen Screening, L.P., and NeoGen Screening, Inc., were acquired by Pediatrix Medical Group, Inc., in 2003. Pursuant to Order of Court dated September 12, 2003 (Docket No. 105), the caption of the case was changed to reflect Plaintiffs' new business names. Nevertheless, for convenience, when referring to events which took place prior to that time, the Court will refer to the NeoGen entities as Pediatrix.

Pennsylvania.  Defendant and Counterclaim Plaintiff TeleChem International, Inc. ("TeleChem"), is a Delaware corporation with its principal place of business in Sunnyvale, California.  TeleChem is in the business of commodity purchase and sale; under the name "arrayit.com," TeleChem manufactures and sells products used in the microarray process[3] of DNA analysis, e.g., glass slides, printing pins, chemicals and related products.  TeleChem has never been involved in newborn genetic screening *per se.*

In November 1999, representatives of both parties met at a professional conference when a Pediatrix researcher announced that the companies were interested collaborating with others to pursue federal research grants.  As a result of shared interests, TeleChem and Pediatrix subsequently agreed to work together in an effort to win Small Business Innovative Research ("SBIR") grants funded by the National Institutes of Health.  The intent of the parties while working on their collaborative efforts was to develop a screening method using microarray technology to detect hereditary hearing loss in newborn infants.  (Plaintiffs' Memorandum in Support of Motion for Summary Judgment, Docket No. 152, "Pediatrix Memo," at 3.)

Pediatrix and TeleChem exchanged a number of letters and eventually entered into two agreements which Pediatrix refers to as "Contract 1" and Contract 2.[4]  Contract 1, a letter dated March 24, 2000, dealt with the parties' initial applications for the SBIR grants.  Contract 2, also referred to as the Pre-Incorporation Agreement, included matters not addressed in Contract 1, e.g., the formation of a new entity to exploit microarray technology and the allocation of proceeds from

---

[3]  According to Plaintiffs' statement of undisputed facts, microarrays are devices in which minute quantities of DNA molecules are immobilized on an underlying substrate closely resembling a glass slide used for examination of small objects with a common microscope.  High density DNA microarrays are routinely fabricated with more than 100,000 distinct elements immobilized to defined sites in an array, each of which identifies a unique genetic feature.  Microarrays decipher complete gene expression patterns or analyze numerous diagnostic amplification products in one assay.  (Pediatrix Memo at 2-3.)

[4]  TeleChem denies that the March 24, 2000 letter was a legally binding agreement, alleging instead that an oral agreement with terms differing from those of Contract 1 was entered into by the parties at approximately the same time.  (TeleChem's Responsive Concise Statement of Material Facts, Docket No. 182, at ¶ 3.)

subsequent grants or business ventures.

Within weeks of signing Contract 2 in April 2001, the collaborative effort began to fall apart, each party blaming the other for the failure. On June 18, 2001, Dr. Naylor wrote to Rene Schena, chief executive officer of TeleChem, complaining that TeleChem had failed to provide its cash capital contribution, failed to assign certain intellectual property to "NGS-ArrayIt, Inc." (the name of the corporation to be created), and failed to execute shareholder and subscription agreements pertaining to NGS-ArrayIt. The parties met in late June in an attempt to iron out these problems. On July 24, 2001, Dr. Naylor again wrote to Ms. Schena stating that because TeleChem had failed to cure the material breaches of its obligations as stated in the June 18th letter, Pediatrix was exercising its right to terminate Contract 2. However, the same letter expressed an interest in continuing to work with TeleChem on an informal basis, e.g., through a joint venture, contract or other business relationship, in order to pursue the parties' interests in commercialization of new screening technology.

Ms. Schena responded on August 21, 2001, stating that TeleChem would not accept Pediatrix's request to terminate Contract 2 and that her company considered the contract to be enforceable. Dr. Naylor replied on August 31, 2001, stating in part that Pediatrix had not made a "request" to terminate Contract 2, but was rather exercising its rights pursuant to that contract. Moreover, if TeleChem insisted that the contract was still in effect, Pediatrix intended to impose the monetary penalties permitted therein for TeleChem's continuing failure to cure.

On November 14, 2001, TeleChem advised Pediatrix that it considered Pediatrix to be in breach of Contract 2, and demanded either specific performance or return of the consideration it had provided in connection with Contract 1.

B.    Procedural History

Pediatrix responded to TeleChem's notice by filing suit in this Court on November 26, 2001, seeking declaratory judgments regarding the status of the commercial ties between the

3

parties and other contract claims.  After Pediatrix filed an Amended Complaint on January 15, 2002

(Docket No. 10), TeleChem filed counterclaims (Counterclaims of TeleChem International, Inc., for

Damages and Injunctive Relief, Docket No. 45, "Counterclaims"), asserting multiple contract-based

claims, and, most importantly for the purposes of this Opinion, misappropriation of its trade secrets

by Pediatrix.

After a long and contentious discovery period, including two appeals to the United States

Court of Appeals for the Third Circuit, each party filed for partial summary judgment.  On February

2, 2005, the parties agreed to have those motions and two related motions decided by a Special

Master appointed for that purpose.  Having considered the motions, supplemental briefing, and oral

argument, the Special Master filed his Report of Proposed Findings and Recommendation (Docket

No. 203, "R&R") on February 1, 2006.[5]  On February 21, 2006, Pediatrix filed the objections which

are addressed herein.  TeleChem did not file its own objections to the R&R but responded to those

of Pediatrix,[6] recommending that the report be adopted as stated.  (Docket No. 218, "TeleChem

Resp.")

     C.    <u>Jurisdiction and Venue</u>

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1)

inasmuch as the amount in controversy exceeds $ 75,000 and the Pediatrix entities are citizens of

Pennsylvania while TeleChem is a citizen of California or Delaware.  28 U.S.C. § 1332(c).  Venue

is appropriate under 28 U.S.C. § 1391(a).

---

[5]  The Report and Recommendation, along with numerous other pleadings, have been filed under seal at the request of the parties.

[6]  TeleChem's rather superficial response contains only one argument in opposition to Pediatrix's objections, that is, they should be dismissed as untimely.  (TeleChem Resp. at 1.)  The Court finds that under Federal Rules of Civil Procedure 6(e) and 5(b)(2)(D), Pediatrix's objections were, in fact, filed timely.  (*See* reasoning set out in Pediatrix's Reply to TeleChem's Response, Docket No. 219, at 1-2.)

## II.   APPLICABLE LAW AND STANDARD OF REVIEW

As the parties have previously conceded, this action is governed by substantive Pennsylvania law.[7]  *See* Glenn Distribs. Corp. v. Carlisle Plastics, Inc., 297 F.3d 294, 300, n3 (3d Cir. 2002), *citing* Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).  Decisions of the Pennsylvania Supreme Court provide the authoritative source of law to this federal court while sitting in diversity.  State Farm Mut. Auto. Ins. Co. v. Coviello, 233 F.3d 710, 713 (3d Cir. 2000).  If the Pennsylvania Supreme Court has not yet passed on an issue, this Court will consider pronouncements of lower state courts, together with federal appeals and district court cases interpreting state law.  Id.

Under Federal Rule of Civil Procedure 53(g), the district court is required to review *de novo* all findings of fact and conclusions of law made by a special master.  After allowing the parties to be heard as to any objections to the special master's conclusions, the court may adopt the report, modify it, reject it in whole or in part, receive further evidence, or recommit the matter to the special master with instructions.

The underlying motions which were considered by the Special Master herein include two motions for partial summary judgment.  A court may grant summary judgment if the party so moving  can show, based on "pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any,  . . . that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c)); Rossetti v. Busch Entertainment Corp., 87 F. Supp.2d 415 (E.D. Pa. 2000).  If a reasonable jury could return a verdict for the non-movant, the dispute is genuine and if, under substantive law, the dispute would affect the outcome of the suit, it is material.  A factual dispute between the parties that is both genuine and material will defeat a motion for summary judgment.  Anderson v. Liberty Lobby, Inc.,

---

[7]  The parties and the Special Master agreed that TeleChem's trade secret claims are governed by Pennsylvania law as it existed prior to enactment of the Uniform Trade Secrets Act, 12 Pa. C.S. §§ 5301-5308 (April 19, 2004).  (R&R at 11, n6)

477 U.S. 242, 247-48 (1986).

In considering a motion for summary judgment, the court must view all the evidence in the light most favorable to the non-movant, accept the non-movant's version of the facts as true, and resolve any conflicts in its favor.  Rossetti, id., *citing* Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).  In short, the movant must show that if the pleadings, depositions and other evidentiary material submitted to date were admissible at trial, the opposing party could not carry its burden of proof based on that evidence and a reasonable jury would thus decide all genuine material disputes in favor of the movant.  Celotex Corp. v. Catrett, 477 U.S. 317, 318 (1986).

Once the moving party has demonstrated that there are no genuine issues of material fact, the burden shifts to the non-moving party to "make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by depositions and admissions on file." Celotex, id. at 322-23; Rossetti, id.; Fed.R.Civ.P. 56(e).  The sum of the affirmative evidence to be presented by the non-moving party must be such that a reasonable jury could find in its favor, and it cannot simply reiterate unsupported assertions, conclusory allegations or mere suspicious beliefs.  Liberty Lobby, id. at 250-252; Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995).

## III.   ANALYSIS

### A.      Report and Recommendation as to
#### Motion for Summary Judgment filed by Pediatrix, Docket No. 151

In his Report and Recommendation, the Special Master first considered Pediatrix's motion for summary judgment on the TeleChem trade secrets counterclaims.  (*See* Counterclaims, Count VIII, Misappropriation of Trade Secrets, and Plaintiffs' Motion for Partial Summary Judgment, Docket No. 151, "Plfs.' Mot.")  In its response to Plaintiffs' first set of interrogatories, dated July 12,

2004, TeleChem contended that during the period July 11, 2000, to November 14, 2001, it disclosed the following trade secrets to Pediatrix:[8]

1.    Use of a C6 amino modifier on one of the two DNA strands;

2.    HPLC purification of oligonucleotides;

3.    Use of Premier Biosoft software for oligonucleotide design;

4.    Oligonucleotide designs with melting temperatures falling within a narrow window;

5.    Both wild type and mutant probes at final concentration of 0.1μM;

6.    Proprietary wash buffer with 2XSSC + 0.1% sarcosyl;

7.    Proprietary scanner settings with laser power at 100, detector gain at 1, number of scans at 1 and detector sensitivity at 1000;

8.    Duplicate spotting of patient samples for commercial applications;

9.    Proprietary microarray training and microarray manufacturing expertise including access to TeleChem's confidential cleanroom facilities in Sunnyvale;

10.   Advertising and promotional strategies including networking with TeleChem contacts, promotional consulting, microarray cleanroom imagery and other laboratory imagery and photographs provided by TeleChem;

11.   Equipment acquisition strategies including the choice of equipment suitable for commercial microarray applications, as well as cost saving strategies for acquisition of that equipment;

12.   Co-marketing strategies;

13.   Business strategies, including the cost of microarray to be amortized over many patients;

14.   Proprietary selection criteria used to identify human disease most suitable for multi-patient microarray analysis, including the genetic complexity of the disease, the treatability of the disease, the acuteness of the disease and other factors and other

---

[8] These alleged trade secrets are not itemized in the Counterclaims.  Also, the dates differ from those in the Counterclaims where disclosure is alleged to have occurred between November 1999 and April 2001.  (Counterclaims, ¶ 11.)  In its opposition to the motion for partial summary judgment, TeleChem refers to trade secrets which were made known to Pediatrix "in late 1999 and into 2000." (Docket No. 180 at 3.)  As the Special Master noted, any disclosures made by TeleChem after June 18, 2001, should necessarily fail because TeleChem could not be considered to have exercised reasonable precautions in protecting its trade secrets after having been accused by Pediatrix of material breaches of Contract 2 on that date.  (R&R at 5, n5.)

considerations;

15.     Corporate patent strategies;

16.     Corporate financing strategies; and

17.     New product ideas and product development strategies, including but not limited to kits for patients to submit samples for screening and analysis.

(R&R at 5-6; *see also* Plfs.' Mot., Exhibit C, TeleChem's Supplemental Responses to Plaintiffs' First Set of Interrogatories Nos. 9 and 12, Response to Interrogatory 9.)

In testimony given on July 18, 2003, Dr. Mark Schena, a primary researcher with TeleChem and the inventor of TeleChem's microarray technology, contended that phrases such as "next generation of technologies," "robotics and automation," and "primary DNA screening, which will be highly automated and utilizing robotics," which Pediatrix had used in press releases, were also references to TeleChem trade secrets Pediatrix had illegally disclosed.  (*See* Expert Report of Zhili Lin, Ph.D., Docket No. 153, "Lin Report.")

It is clear from the face of the motion for summary judgment that Pediatrix intended its motion to encompass all 17 claims identified in the interrogatories, as well as the alleged secrets regarding "next generation of technologies" and "laboratories and robotics" identified in Dr. Schena's testimony.[9]  We reach this conclusion from the reference in the motion to TeleChem's precise definition of the trade secrets it possesses being derived from "cross examination of TeleChem's Dr. Mark Schena and repeated written discovery requests."  (Plfs.' Mot. at 3.)  In addition, although the memorandum in support of the motion concentrates on the scientific trade secrets, it concludes with a request for the Court to enter "an order granting partial summary

---

[9]  The Court notes as a threshold matter that TeleChem's Counterclaims filed on April 25, 2002, did not identify any of the 17 alleged trade secrets, referring only generically to the existence of such secrets and thus failed to give Plaintiffs fair notice of its claims.  *See* Conley v. Gibson, 355 U.S. 41, 47-48 (1957) (complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.")  It was not until Dr. Schena testified on July 18, 2003, and TeleChem responded to Pediatrix's interrogatories on July 12, 2004, more than two years after the Counterclaims were filed, that the alleged trade secrets were identified.

judgment in [Pediatrix's] favor . . . dismissing, with prejudice, *any and all claims* or causes of action asserted by TeleChem based on alleged misappropriation of alleged TeleChem trade secrets." (Pediatrix Memo at 21, emphasis added.)

Pediatrix offered three reasons why summary judgment should be granted in its favor on these claims:

1.    Any trade secrets TeleChem may have possessed were invalidated when the application for U.S. Patent No. 6,913,879 ("the '879 patent") was published on January 17, 2002;

2.    Trade secrets not disclosed in the '879 patent application are unenforceable inasmuch the failure to disclose them perpetrated a fraud on the United States Patent Office; and

3.    TeleChem's alleged trade secrets are not valid in any event because they were within the public domain prior to disclosure to Pediatrix.

(Pediatrix Memo at 8-9, *see also* R&R at 11.)

The Special Master found none of these arguments persuasive.  First, at oral argument held on July 25, 2006, TeleChem contended that trade secrets 9 through 17 above (the "commercial trade secrets") were developed after the '879 patent was filed on July 10, 2000.  (R&R at 12.)  The Special Master concluded, based in part on his review of the '879 patent application, that the commercial trade secrets were not disclosed in that application and therefore would not have been disclosed as part of the patent publication process in January 2002.  (R&R at 12-13.)  He rejected the second argument as well, reasoning that the failure to disclose the commercial trade secrets – if indeed, such disclosure were required when the patent went to the underlying technology rather than to business methods – would go to the validity of the '879 patent itself, not to the existence of any trade secrets.  In other words, the  question of whether TeleChem complied with the disclosure requirements of the Patent Act in applying for the '879 patent would not affect the validity of TeleChem's alleged trade secrets.  (R&R at 13-14.)  Finally, the Special Master rejected the third argument, finding that Pediatrix had focused on the first eight alleged trade secrets (the "scientific

trade secrets") and ignored the commercial trade secrets when arguing that the content of the trade secrets was in the public domain.  He concluded that "entry of summary judgment on TeleChem's trade secret claim without even a challenge to these asserted trade secrets would be inappropriate. Not only is there a lack of evidence proposed by either party, but there is nothing short of complete silence about them." (R&R at 14-15.)  He therefore recommended that the Court deny Pediatrix's motion for summary judgment as to all the trade secret counterclaims.  (R&R at 15.)

Pediatrix objects to this recommendation, arguing that the R&R should be rejected because the Special Master improperly shifted the burden of proof on the counterclaims from TeleChem to itself.  That is, as the non-moving party with the burden of proof at trial, TeleChem was required to show that there were genuine issues of material fact which precluded summary judgment in Pediatrix's favor. Although the Special Master acknowledged that TeleChem had failed to do so, he improperly recommended denying the motion because Pediatrix had not come forward with evidence to support its position.  (Pediatrix Obj. at 9-11.)  Moreover, despite the fact that the Special Master had correctly acknowledged that where the movant is not the party with the burden of proof on the matter in question at trial, the movant has no obligation to produce evidence negating his opponent's case, he failed to properly apply that principle herein.  (Id.)

Under the posture of this case, TeleChem, the party claiming misappropriation of trade secrets, will have the burden of showing at trial:  (1) the existence of a trade secret; (2) communication of the trade secret pursuant to a confidential relationship;[10] (3) use of the trade secret in violation of that confidence; and (4) harm to itself.  Moore v. Kulicke & Soffa Indus., 318 F.3d 561, 566 (3d Cir. 2003), citing Van Products Co. v. General Welding & Fabricating Co., 213 A.2d 769, 774 (Pa. 1965), and Restatement (First) of Torts, § 757.  A trade secret has been defined as "any formula, pattern, device, or compilation of information which is used in one's

---

[10]  The parties do not dispute the fact that during their collaboration, certain intellectual property was shared among scientists pursuant to non-disclosure agreements.

business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."  Felmee v. Lockett, 351 A.2d 273, 277 (Pa. 1976).  The plaintiff bears the burden of proving that it developed the alleged trade secret and that the information was a secret, i.e., was not a matter of public knowledge.  William M. Hendrickson, Inc. v. Amtrak, CA No. 00-3711, 2002 U.S. Dist. LEXIS 4097, *48 (E.D. Pa. Mar. 13, 2002), aff'd, 2003 U.S. App. LEXIS 4606 (3d Cir. Mar. 14, 2003).

At summary judgment, as the movant on the trade secret claims, Pediatrix satisfies its burden under Rule 56 by simply by "pointing out" that there is no evidence to support one or more elements of TeleChem's case.  Celotex, 477 U.S. at 325 ("the burden on the moving party may be discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case"); see also Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004).  While Pediatrix has no obligation to produce evidence itself, TeleChem may not rest on its allegations to withstand summary judgment.  Instead, it must produce evidence from which a fact-finder could reasonably find in its favor on the disputed claims.  Celotex, 477 U.S. at 324 ("Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'")

In support of its motion for summary judgment, Pediatrix offers expert reports by Dr. Zhili Lin, a principal researcher at Pediatrix, and by Dr. Daniel Farkas, Medical Director of the Molecular Diagnostics Laboratory at The Methodist Hospital, Houston, Texas[11] (Docket No. 155.)  The experts offer opinions to support Pediatrix's arguments that either (1) the alleged secret was already well-known in the field prior to the earliest time at which the alleged misappropriation took

---

[11]  Pediatrix also offered expert reports by Thomas Paul, Esq., and Kenneth McKay, Esq.  The Special Master recommended that each of these reports be stricken, a recommendation which, as discussed below, has been accepted by the Court.  Those reports, therefore, are not considered in this portion of the analysis.

place or (2) the information is not a protectable trade secret.

In response to Pediatrix's motion, TeleChem argued that declarations by Dr. Schena and Mr. Neil Winegarden support its claim that TeleChem transferred trade secrets to Pediatrix which Pediatrix then made public or used in its own research without permission, thereby avoiding research and development costs. In either case, TeleChem was damaged as a result of the diminution of the value of the secret. (TeleChem International, Inc.'s Opposition to Motion for Partial Summary Judgment, Docket No. 180, at 4-6.)

1. *Commercial Trade Secrets:* We turn first to items 9 through 17, the commercial trade secrets. These alleged secrets are not mentioned in TeleChem's brief in opposition to the motion for summary judgment. Dr. Schena's declaration (Docket No. 185) does not address any of those items, but instead concentrates only on the scientific trade secrets which will be addressed below. Mr. Winegarden's declaration (Docket No. 184, "Winegarden Decl.") also concentrates on the scientific trade secrets, but provides an analysis of "the Bates," a document which was not defined in TeleChem's brief in opposition to the motion for summary judgment and which the Court has been unable to independently identify. Mr. Winegarden lists, but does not address, items 12 through 17 and offers the following commentary on items 9, 10, and 11.

9. Proprietary microarray training and microarray manufacturing expertise including access to TeleChem's confidential clean room facilities in Sunnydale.

". . . . The combined knowledge (know-how) developed during the many years of experience at TeleChem would put them in a much greater [sic] position to move into a commercial microarray application than Pediatrix. . . . It is known in the industry that TeleChem/ArrayIt have spent a lot of time and money developing pop-up clean rooms for microarray manufacture. Without having fully analysed [sic] their clean room I would not be able to reconstruct the environmental enclosure they have developed." (Winegarden Decl., Exhibit B at unnumbered page 6.)

10. Advertising and promotional strategies including networking with TeleChem contacts, promotional consulting, microarray clean room imagery and other laboratory imagery and photographs provided by TeleChem.

"TeleChem is one of the most recognisable names in the microarray field.  Virtually everyone in this space is familiar with their product line. . . . As such, TeleChem has one of the (if not the) largest networks of contacts involved in microarray technology.  In order to make a success of the proposed NGS-ArrayIt this network would have been invaluable."  (Winegarden Decl., id.)

11.   Equipment acquisition strategies including the choice of equipment suitable for commercial microarray applications, as well as cost saving strategies for acquisition of that equipment.

"The choice of the right equipment for microarray manufacture and analysis is critical.  TeleChem probably has the largest collected experience in terms of testing and validating various pieces of equipment.  It has been our experience that this is one of the most sought after pieces of information. . . . TeleChem's knowledgebase [sic] would be extremely valuable.  The knowledge that TeleChem has acquired could easily lead to a minimum one year advantage for a group getting started (a company trying to start without such knowledge would take a minimum of a year to be fully functional, probably more like 18 months.)" (Winegarden Decl., Exhibit B at 6-7.)

The problem with Mr. Winegarden's comments on the claims above is that he offers no factual evidence to support a conclusion that TeleChem maintained the information referred to in those three claims as trade secrets, or to verify TeleChem's allegations that Pediatrix used or disclosed such information.  As to Dr. Schena's contention that the phrase "transition to more laboratory robotics and automation" is a reference to a TeleChem trade secret, Mr. Winegarden opined, "Dr. Schena is of course correct when he states that robotics and automation are absolutely essential aspects of microarray technology."  (Winegarden Decl., Exhibit B at 4.)  This statement does not support a conclusion that TeleChem used secret applications of robotics or automation, nor clarify how Pediatrix's use of this phrase in some way disclosed a trade secret.

The Court agrees that neither Pediatrix nor TeleChem discussed the commercial trade secrets in their moving papers.  The Special Master concluded, however, that because *Pediatrix* ignored the commercial trade secrets, "entry of summary judgment on TeleChem's trade secret claim without even a challenge to these asserted trade secrets would be inappropriate."  (R&R at

14.)   The Court agrees with Pediatrix that once it moved for dismissal of "any and all claims" of trade secret misappropriation, TeleChem was obligated to show that each and every claim was a protectable trade secret.   TeleChem failed to come forward with any evidence to support its claims of commercial trade secrets and, therefore, the Special Master should have granted summary judgment in favor of Pediatrix on those claims and on the phrases claimed as trade secrets in Dr. Schena's testimony.   We will therefore sustain Pediatrix's objections to the Special Master's recommendation and grant summary judgment in favor of Pediatrix as to TeleChem's claims of commercial trade secrets.

2.   *Scientific Trade Secrets:*   Pediatrix further argues that the Special Master reached an opposite conclusion with regard to the scientific trade secrets.   That is, Pediatrix claims that the Special Master found summary judgment should be granted in its favor on claims 1 through 8, or, at least, the Report and Recommendation was ambiguous in this regard.   (Pediatrix Obj. at 11-12.) The Court disagrees.

We conclude, however, that the Special Master did not explicitly address or make any recommendation with regard to the scientific trade secrets.   We also conclude that summary judgment may not be granted on those matters.   Pediatrix presented the Lin affidavit and Farkas expert report, each of which addresses those secrets in detail.   TeleChem countered with the Schena and Winegarden declarations.[12]   Although Pediatrix argues in its objections that its reports are conclusive evidence that all of the alleged scientific trade secrets are in fact well known in the field, at summary judgment, the Court may not weigh the evidence.   We conclude that TeleChem has come forward with sufficient evidence to raise genuine issues of material fact as to the

---

[12]   The Court notes that both Dr. Schena's and Mr. Winegarden's declarations add to the descriptions of scientific trade secrets 1-5, 7, and 8 the phrase ". . . for multi-patient genotyping [screening.]"   This addition may, potentially, change the scope of each alleged trade secret as described in TeleChem's answers to the interrogatories.   At this time, however, the Court accepts the reports, subject to clarification of this point, if necessary, in the future.

existence of the scientific trade secrets set out items 1 through 8 of its answers to the written interrogatories, as well its ownership thereof and the use of those alleged secrets by Pediatrix.  We therefore overrule Pediatrix's objections to the Special Master's recommendation and deny summary judgment to Pediatrix as to the scientific trade secrets.

      B.      Report and Recommendation as to
                TeleChem's Motion to Strike Affidavit and Expert Reports, Docket No. 183

In light of his decision to deny Pediatrix's motion for summary judgment as to TeleChem's counterclaims for trade secret misappropriation,[13] the Special Master recommended that TeleChem's motion to strike the affidavit of Dr. Lin and the expert reports of Messrs. Farkas, Paul, and McKay be denied as moot.  (R&R at 15.)  However, anticipating that the parties might raise objections to his report with this Court, the Special Master offered his analysis on each of those four documents.  He recommended that the Court deny the motion as to the Lin affidavit and the Farkas expert report, and grant it as to the expert reports of Messrs. Paul and McKay.  (Id. at 15-18.)

TeleChem did not object to the recommendation that its motion to strike the Lin and Farkas expert reports be denied.  The Court has reviewed those documents and accepts the Special Master's recommendation that they not be stricken, including his conclusion that five paragraphs in the Lin report and eight paragraphs in the Farkas report to which TeleChem had explicitly objected should not be excised.[14]

On the other hand, Pediatrix objected to the recommendation that the Paul and McKay

---

[13]  Pediatrix did not seek summary judgment as to TeleChem's counterclaims stated at Count I, breach of Contract 2; Count II, rescission of Contract 2; Count III, misrepresentation; Count IV, interference with prospective economic advantage; Count V, conversion; Count VI, imposition of a constructive trust; or Count VII, deceptive business practices.  Therefore, those claims remain viable.

[14]  The Special Master noted TeleChem had stated that the Lin affidavit and Farkas expert report showed that Pediatrix had violated the protective order preventing them from providing confidential information to others, but did not proffer this as a further reason to strike the reports.  (R&R at 16.)  TeleChem does not revisit this point in its response to Pediatrix's objections, and the Court declines to do so on its behalf.

reports be stricken.  (Pediatrix's Obj. at 19.)   Telechem's response to Pediatrix's objections fails to offer any argument on this point.  In fact, TeleChem appears to acquiesce with Pediatrix' arguments regarding Mr. Paul's expert report because its prayer for relief includes only the request that the Court "strike the affidavit of Ken McKay in support of Pediatrix's Motion for Summary Judgment."  (TeleChem Resp. at 3.)

In its motion to strike the expert reports, Telechem argued first that Mr. Paul's expert report (Docket No. 162, "Paul Report") should be stricken because it was not timely served upon counsel for TeleChem despite repeated requests.  (Motion to Strike, Docket No. 183, at 2.)  No evidentiary support for this argument is set forth in TeleChem's motion, the Court cannot identify any such evidence in the record, and the argument is not further pursued in TeleChem's response to Plaintiffs' objections.  It will therefore be disregarded.  Second, TeleChem argues that the report "consists of pure legal conclusion."  Third, TeleChem argues that if neither of these reasons is sufficient to strike the report, Mr. Paul's reference to "Dr. Schena's overreaching in an attempt to create a trade secret cause of action" should be stricken because it is argumentative.  (Id.)

The Special Master agreed that Mr. Paul's report should be stricken "as little more than legal opinion, a province more appropriately assigned to Court."  (R&R at 17.)  The Special Master determined that "in virtually every paragraph of the Paul report . . . he makes reference to the scientific conclusions drawn by [Dr. Lin and Dr. Farkas], the experts proffered by Pediatrix and relies on them to conclude, summarily, that the information cannot be a trade secret. . . . This is essentially nothing more than an acceptance by . . . [Mr.] Paul of Dr. Lin's report and reaching the conclusion that the information 'cannot be a trade secret.'"  (Id.)

In its objections to the Report and Recommendation, Pediatrix argues that the Paul Report is not simply "an application of the law to the facts at hand," as it was characterized by the Special Master.  Pediatrix points out that Mr. Paul is a noted molecular biologist whose education makes him uniquely qualified to be aware of matters related to that field which are in the public domain.

His expert report is not offered as legal opinion but rather to present evidence that the alleged trade secrets were actually well-known in the field.  In sum, the Paul Report sets forth opinions based on facts known to him as scientist based on his own experience or findings of others on which scientists reasonably may rely.  (Pediatrix Obj. at 20-21.)

The Court has reviewed Mr. Paul's expert report which refers in turn to the reports of Drs. Lin and Farkas.  The Court finds the Paul Report does no more than recap the findings of those experts, concluding that each of the claimed trade secrets – for the reasons set out in one or both of the underlying reports – is not secret.  As TeleChem successfully argued to the Special Master, the bases for those conclusions are set forth quite clearly in the scientific reports and Mr. Paul's gloss on them is unnecessary.  Contrary to Pediatrix's assertion that Mr. Paul provided additional evidence that the alleged trade secrets are well-known in the field, the Court finds that with a single exception, nothing new is added to the discussions in the expert reports.  That exception refers to a patent Mr. Paul received in 1989 which, according to him, employed the same concept of using multi-probes for PCR analysis in a single assay which Dr. Schena described as a TeleChem trade secret.  (Paul Report, ¶ 6.)  There is already support in the Lin and Farkas reports for the argument that this scientific process was in the public domain prior to the time TeleChem began using it.  Therefore, this point is redundant and need not be considered at summary judgment.  The Court will accept the Special Master's recommendation that the expert report of Thomas Paul, Esq., be stricken.

The Special Master also recommended that the expert report submitted by Mr. McKay (Docket No. 154) be stricken as "a legal brief containing numerous case citations and interpretation of patent law to facts at hand" which "offers nothing more than what the Court is already well equipped to provide."  (R&R at 17.)  In its objections, Pediatrix argues that Mr. McKay's report is "wholly consistent" with prior requests by the Court for detailed explanations of trade secret and patent law.  (Pediatrix Obj. at 22.)

17

The Court agrees that Mr. McKay's report is no more than a legal brief containing legal argument and citations to law which supports Pediatrix's position – repeatedly stated elsewhere – that the trade secrets claimed by TeleChem were not, in fact, secret or, if they had been secret at some point, had been disclosed to the public.  There is little or no explanation of the finer points of trade secret and/or patent law which would assist the Court in understanding the arguments made by the parties.  The Court therefore agrees with the Special Master's recommendation to strike the report submitted by Mr. McKay.

      C.     Report and Recommendation as to
            Motion to Compel Discovery filed by TeleChem, Docket No. 178

TeleChem filed a motion to compel discovery seeking "information relating to Pediatrix's use, creation and/or maintenance of LightTyper technology."  (Expedited Motion to Compel Production of Documents, Docket No. 178, at 3.)  TeleChem argues that although it has repeatedly sought through authorized discovery methods information regarding Pediatrix's use of TeleChem's multi-patient microarray technology, Pediatrix has refused to provide responsive documentation, claiming that it was no longer using TeleChem's microarray technology, but instead LightTyper technology developed by a third party.  TeleChem contends that the new processes which Pediatrix claims utilize LightTyper technology actually incorporate trade secrets which TeleChem provided in contemplation of the joint venture.  (Id.)

In opposing the motion to compel, Pediatrix argues that the information sought is not relevant because LightTyper technology is completely different from the microarray technology developed by TeleChem.  (Plaintiffs' Response to Defendant's Motion to Compel Production of Documents, Docket No. 189, at 2.)  In support of that argument, Pediatrix provides excerpts from the deposition testimony of Dr. Carl Wittwer, the inventor of LightTyper technology, who testified that the two technologies are wholly distinct and unrelated.  (Id. at 3-7.)  TeleChem counters with testimony by Dr. Wittwer which allegedly admits that the use of LightTyper technology was "merely

18

a superficial conversion" of technology TeleChem had transferred to Pediatrix. (Docket No. 192 at 7.)

The Special Master concluded that discovery of any documents concerning the "creation" by a third party of the LightTyper core technology which may be in Pediatrix's possession was not appropriate. On the other hand, he recommended that limited discovery be allowed to proceed as to documentation pertaining to Pediatrix's "use" and "maintenance" of LightTyper technology, i.e., how that technology was implemented by Pediatrix, including evidence of any modifications it made to LightTyper technology which might have been derived from its prior work using TeleChem's microarray technology. (R&R at 18.) The documentation to be produced would be limited to

> the use and maintenance of substrates employed in connection with DNA analysis and patient genotyping (the areas where microarrays are employed) about which TeleChem complains. . . . Any documents created prior to June 11, 2000, should be excluded from this discovery because they necessarily predate the conception date for the trade secrets about which TeleChem complains. [Moreover, the documents] should be confined to research and engineering type documents that either demonstrate the presence or confirm the absence of microarray technology employed in any improvements, accessories, "new applications" or other modifications that Pediatrix may have made to the third-party technology known as LightTyper. . . . Pediatrix should . . . ensure that the rights of third parties are adequately protected and sufficient notice of intended disclosure . . . to TeleChem is provided before any disclosure is made of trade secrets or intellectual property owned by third parties, even though disclosure would be made pursuant to court order and under the terms of the protective order in force in this case.

(R&R at 19.)

Pediatrix did not explicitly object to this recommendation, apparently believing that it was unnecessary in light of its arguments regarding trade secrets. The Court will therefore accept the Special Master's recommendation for limited discovery, as set forth in more detail in the attached order.

     D.    Report and Recommendation as to
               <u>Motion for Summary Judgment filed by Telechem, Docket No. 156</u>

In its Motion for Summary Judgment, Telechem seeks dismissal of the three

remaining counts of Pediatrix's Amended Complaint: Count V, specific performance on Contract 1; Count VI, breach of Contract 1, and Count IX, breach of Contract 2. Neither party objects to the Special Master's recommendation that TeleChem's motion be granted in part and denied in part. (R&R at 19-22.) That is, the Special Master recommended that the motion be granted as to Count V inasmuch as the parties stipulated to its dismissal at oral argument, agreeing that Contract 1 (which pertains only cooperation on the SBIR grants) has been completed and there is no genuine issue of material fact regarding Plaintiffs' need for specific performance by TeleChem. On the other hand, the Special Master concluded that summary judgment be denied as to Counts VI and IX because record evidence shows that genuine issues of material fact exist with regard to performance and/or breach of those contracts. (Id.)

Along with the Special Master's Report, the Court has reviewed Plaintiffs' Supplemental Brief with Respect to Issues Identified by the Special Master (Docket No. 197), and TeleChem's Reply to the Opposition to Motion for Summary Judgment (Docket No. 195), in addition to the briefs in support of and in opposition to TeleChem's motion for summary judgment. (Docket Nos. 156 and 187.) The Court finds no reason to disagree with either the Special Master's analysis or his conclusions. In the absence of objections by either party as to this portion of the Report, the Court accepts the Special Master's recommendation and will grant summary judgment in favor of TeleChem as to Count V and deny it as to Counts VI and IX.

E.    Other Outstanding Motions

The Court notes from the docket that six additional motions have not been formally addressed. In the interest of preparing this case for immediate trial, we resolve each of those outstanding motions as follow:

Docket Nos. 163, 165, and 169 are denied as moot, the issues addressed therein having been resolved by agreement of the parties and/or the passage of time;

Docket No. 172, a motion for miscellaneous relief, is denied as moot, the issues therein having been resolved by the Court's granting TeleChem's motion to place

20

certain information under seal;

Docket No. 211, an unopposed motion to withdraw as attorney, is denied as moot, the motion having been replaced by Docket No. 215 which was granted by the Court on April 10, 2006 (Docket No. 221); and

Docket No. 220, a motion for in-camera review, is denied as moot, the underlying motion having been granted by the Court at Docket No. 222.

An order reflecting the conclusions of the Court herein follows.

July 21, 2006 _____   /s/ Arthur J. Schwab _____
                                          Arthur J. Schwab,
                                          United States District Judge
                                          for
                                          William L. Standish,
                                          United States District Judge

cc:    Jeffrey G. Brooks
       8 East Pine Avenue
       Washington, PA 15301
       Email: jgb@jgbrooks.com

       Barry J. Coyne
       Reed Smith
       435 Sixth Avenue
       Pittsburgh, PA 15219-1886
       Email: bcoyne@reedsmith.com

       Kevin S. Katona
       Reed Smith
       435 Sixth Avenue
       Pittsburgh, PA 15219-1886
       Email: kkatona@reedsmith.com

       Robert D. Kucler
       Reed Smith
       435 Sixth Avenue
       Pittsburgh, PA 15219-1886
       Email: rkucler@reedsmith.com